1   Jerome R. Doak (*pro hac vice*)
    JONES DAY
2   2727 North Harwood Street
    Dallas, Texas  75201-1515
3   Telephone:    (214) 220-3939
    Facsimile:    (214) 969-5100
4   Email:  jrdoak@jonesday.com

5   Richard J. Grabowski (State Bar No. 125666)
    JONES DAY
6   3 Park Plaza, Suite 1100
    Irvine, California 92614-8505
7   Telephone:    (949) 851-3939
    Facsimile:    (949) 553-7539
8   Email:  rgrabowski@jonesday.com

9   Counsel for Defendants
    CONSUMERINFO.COM, INC., ET AL.
10  Filed Jointly with Counsel for Plaintiff
    Listed on the Signature Page

11

12                UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                     SAN JOSE DIVISION

15

16  CHUCK BROWNING,                          Case No. C04-01463 HRL
    individually and on behalf of all persons
17  similarly situated,

18              Plaintiff,

19          v.

20  YAHOO! INC.;
    CONSUMERINFO.COM, INC.; and
21  EXPERIAN NORTH AMERICA, INC.;

22              Defendants.

23

24       **JOINT MEMORANDUM IN SUPPORT OF JOINT MOTION FOR
         FINAL APPROVAL OF AMENDED SETTLEMENT**

25

26  June 14, 2007

27

28

    MEM. IN SUPP. OF FINAL APP. OF AM.
    SETTLEMENT — NO. C04-01463 HRL

1

**TABLE OF CONTENTS**

2

Page

3   I.      Introduction ............................................................................................. 1

4   II.     Statement Of Facts ................................................................................. 1

5           A.      History Of The Litigation And Settlement Negotiations ............................ 3

6           B.      Class Certification And Settlement Notice ..................................................... 4

            C.      CAFA Notice ...................................................................................................... 5

7           D.      Receipt Of Opt Outs ......................................................................................... 6

            E.      Receipt Of Objections ...................................................................................... 6

8   III.    Argument .................................................................................................... 7

9           A.      The Requirements For Certification Of A Rule 23(b)(3) Settlement
                    Class Are Satisfied ............................................................................................ 7

10          B.      Notice To Settlement Class Members Was The Best Notice
11                  Practicable And Reasonably Calculated To Apprise Class Members
                    Of The Settlement, And CAFA Notice Was Also Implemented .................. 8

12                  1.      Class-Action Notice And Class-Action Settlement Notice ............... 8

13                  2.      CAFA Notice ......................................................................................... 9

            C.      The Proposed Class Action Settlement Is Fair, Reasonable, And
14                  Adequate, And Should Be Approved ........................................................... 10

15                  1.      The Strength Of The Plaintiff's Case ............................................... 11

16                  2.      The Risk, Expense, Complexity, And Likely Duration Of
                            Further Litigation ............................................................................. 13

17                  3.      The Risk Of Maintaining Class Action Status Throughout The
                            Trial ................................................................................................... 14

18                  4.      The Amount Offered ......................................................................... 15

19                  5.      The Extent Of Discovery Completed ............................................... 16

20                  6.      The Experience And Views Of Counsel .......................................... 16

                    7.      The Presence Of A Governmental Participant ................................ 17

21                  8.      The Reaction Of The Class Members To The Proposed
22                          Settlement ......................................................................................... 17

            D.      The Objections To The Settlement Lack Merit And Should Not Be
23                  Sustained ......................................................................................................... 18

24                  1.      Objections To The In-Kind Relief .................................................... 19

                    2.      Objections To Automatic Renewal Of The Credit-Monitoring
25                          Benefit ................................................................................................ 20

26                  3.      Objections To The Requested Amount of Attorneys' Fees ............ 21

                    4.      Objections To The Claims Process ................................................... 22

27                  5.      Objections To The Scope Of The Release ....................................... 23

28                  6.      Irrelevant Or Incomprehensible Objections ................................... 24

1

2

**TABLE OF CONTENTS**
**(continued)**

Page

3          a.      Incomprehensible Objections.................................................. 24

4          b.      Irrelevant Objections About A Class Member's
                   Particular Credit Report ......................................................... 24

5          c.      Irrelevant Objections About A Class Member's
                   Original Purchase Of The Defendants' Products.................. 24

6    IV.   Conclusion .......................................................................................... 25

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ............................................................................................... 7

*In Re Broadcom Corp. Sec. Litig.*,
   No. SACV 01-275 DT, 2005 U.S. Dist. LEXIS 41983
   (C.D. Cal. Sept. 12, 2005) .................................................................................... 17

*Churchill Village, LLC v. Gen. Elec.*,
   361 F.3d 566 (9th Cir. 2004) ............................................................................... 10

*Clark v. Experian Information, Inc*,
   233 F.R.D. 508 (N.D. Ill. 2005) .......................................................................... 24

*Clark v. Experian Info. Solutions, Inc.*,
   No. 03*C* 7882, 2006 WL 2224049 (N.D. Ill. Aug. 2, 2006) ................................ 24

*Glass v. UBS Fin. Servs., Inc.*,
   No. C-06-4068 MMC, 2007 WL 221862
   (N.D. Cal. Jan. 26, 2007).................................................................. 12, 13, 17, 18

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998)............................................................. 10, 16, 17, 19

*Helms v. ConsumerInfo.com, Inc.*,
   236 F.R.D. 561 (N.D. Ala. 2005) ............................................................. 7, 13, 15

*Helms v. ConsumerInfo.com, Inc.*,
   436 F. Supp. 2d 1220 (N.D. Ala. 2005) ......................................................... 11, 12

*In re Heritage Bond Litig.*,
   2005 WL 1594403 (C.D. Cal. June 10, 2005)...................................................... 14

*Hillis v. Equifax Consumer Servs., Inc.*,
   237 F.R.D. 491 (N.D. Ga. 2006) .................................................................... 12, 14

*Hillis v. Equifax Consumer Servs., Inc.*,
   No. 04-3400, slip op. (N.D. Ga. June 12, 2007).................................................. 12

*Klay v. Humana, Inc.*,
   382 F.3d 1241 (11th Cir. 2004) ........................................................................... 13

*Linney v. Cellular Alaska P'ship*,
   151 F.3d 1234 (9th Cir. 1998)............................................................................. 10

*Nat'l Rural Telecomm. Coop. v. DirecTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) ........................................................................ 17

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Young v. Polo Retail, LLC*,
    No. C-02-4546, 2007 WL 951821 (N.D. Cal. Mar. 28, 2007)......................... 10,15

**STATE CASES**

*Cal. Consumer Action Network v. ConsumerInfo.com, Inc.*,
    No. GIC797867 (Super. Ct. San Diego County Ct. Apr. 1, 2003)........................ 24

**FEDERAL STATUTES**

Class Action Fairness Act of 2005 ("CAFA"),
    28 U.S.C. § 1715(b).............................................................................. 5, 7, 8, 9, 16

**TEXTS**

DAVID F. HERR, ANNOTATED MANUAL FOR COMPLEX LITIGATION (4th ed. 2005)........... 8

1

2

## I.     INTRODUCTION

3       The parties jointly request the Court's final approval of their Amended Settlement

4  Agreement in this class action brought under the Credit Repair Organizations Act.

5       On December 27, 2006, the Court entered an order that certified a tentative

6  settlement class under Federal Rule of Civil Procedure 23(b)(3), preliminarily approved

7  the parties' Amended Settlement Agreement, approved and directed a plan for giving

8  notice to class members, appointed Class Counsel, and appointed the Settlement

9  Administrator.  Prelim. Approval Order (Docket No. 137).  That preliminary-approval

10 order also set deadlines for objecting to the settlement and for requesting exclusion from

11 the settlement class, as well as other interim deadlines leading up to the final-approval

12 hearing to be held on July 31, 2007.  In compliance with the Court's order, defendants and

13 the Settlement Administrator have caused notice of this proposed settlement to be sent to

14 14 million settlement class members and notice under Class Action Fairness Act

15 ("CAFA") to be sent to the United States Attorney General, attorneys general in all 50

16 states and the District of Columbia, the Federal Trade Commission's Western Regional

17 Office, and 11 other state agencies that specifically monitor the credit industry.  The

18 parties and their counsel now respectfully request final approval of the proposed

19 settlement that entirely resolves the claims brought by the Named Plaintiff on behalf of

20 himself and the Settlement Class, against ConsumerInfo.com, Inc. ("ConsumerInfo");

21 Experian North America, Inc.; and Yahoo! Inc.

## II.    STATEMENT OF FACTS

22

23       The Amended Settlement Agreement, on behalf of a class of purchasers of credit

24 monitoring and credit score products from June 17, 1998 to December 27, 2006, resolves

25 litigation brought against the defendants under the Credit Repair Organizations Act

26 ("CROA"), 15 U.S.C. § 1679.  While defendants deny that they fall within the definition

27 of a "credit repair organization" under CROA and deny that plaintiff's claims could be

28

certified as a class action for trial purposes, the defendants agreed in the Amended Settlement Agreement to certification of the settlement class and to provide remedial and in-kind relief to class members.  As in-kind relief, ConsumerInfo has agreed to offer, without charge, to any eligible Settlement Class Member, either an Experian credit score or 60 days of credit monitoring.  Am. Settlement Agreement § IV.F, G (Docket No. 132-2).  As remedial relief, ConsumerInfo and the Experian Entities have agreed to delete and/or modify language on particular Internet webpages, and ConsumerInfo also has agreed not to make certain statements in connection with the sale of credit scores and/or credit monitoring directly to consumers over the Internet.[1]  Am. Settlement Agreement § IV.B, C (Docket No. 132-2).  ConsumerInfo and Experian have also agreed to pay Class Counsel for their reasonable attorneys' fees, costs, and expenses, up to a total request of $2,550,000, subject to Court approval.  Am. Settlement Agreement § V.A (Docket No. 132-2).

In return, plaintiff and class members agreed to release defendants and their Marketing Partners and Affiliates from CROA claims and from claims where the stated basis is about improvement of a consumer's credit record, history, or rating, as specifically set forth in section IV.B. of the settlement.[2]  The complete terms of the settlement are set forth in the Amended Settlement Agreement (Docket No. 132-2).

---

[1] The Yahoo! product at issue in this lawsuit, known as "Yahoo! Credit Manager," is no longer offered.

[2] Following the Court's interim orders on the originally-proposed settlement, the parties revised their release in the Amended Settlement Agreement, to avoid vague language and to add specificity.  Interim Order On J. Mot. For Certification Of Tentative Settlement Class & Preliminary Approval Of Proposed Settlement (Docket No. 119) (May 19, 2006); Second Interim Order On J. Mot. For Certification Of Tentative Settlement Class & Preliminary Approval Of Proposed Settlement, Etc., at 4-6 (Docket No. 126) (July 6, 2006); Third Interim Order On J. Mot. For Certification Of Tentative Settlement Class & Preliminary Approval Of Proposed Settlement, Etc. (Docket No. 130) (Aug. 10, 2006).

A short history of the *Browning* and *Helms v. ConsumerInfo.com, Inc.*, No. CV-03-HS-1439-M (N.D. Ala., filed June 17, 2003) cases is offered below to demonstrate how the litigation of those cases led to the mediation and negotiations that ultimately resulted in this settlement.  A more detailed account of the *Helms* and *Browning* litigation and the settlement negotiations was provided in the parties' preliminary-approval memorandum, at 1-7 (Docket No. 132-1); *see also* Aff. of Rodney A. Max (Docket No. 132-7).

In an effort not to refile the same documents with the Court, the parties will instead cite to the docket entries for the documents, orders, and appendix materials that have been previously filed in this case.  For example, the parties will cite to the settlement as Am. Settlement Agreement at __ (Docket No. 132-2), the preliminary approval memorandum as Prelim. Approval Mem. at __ (Docket No. 132-1), and the preliminary approval order as Prelim. Approval Order at __ (Docket No. 137).

**A.     History Of The Litigation And Settlement Negotiations**

The *Helms* and *Browning* proposed class actions involved similar CROA claims brought by the same plaintiffs' counsel.  *Helms* was filed first against ConsumerInfo.com, Inc. in Alabama federal district court, and *Browning* was later filed against Yahoo! Inc. in this Court.  On June 20, 2005, after the Alabama district court had denied class certification in *Helms*, Plaintiff Browning filed a Second Amended Class Action Complaint (Docket No. 78), in this case, adding ConsumerInfo.com, Inc. and Experian North America, Inc. as additional defendants.

The settlement now presented to the Court for final approval, as amended, was reached in mediation after the parties had conducted substantial discovery and motion practice in both *Browning* and *Helms*.  In *Browning*, the parties responded to interrogatories, requests for admissions, and document requests.  The *Browning* parties also stipulated that all of the discovery taken in *Helms* would be treated as if it had been conducted in *Browning*.  Further, the parties engaged in motion practice in *Browning*.  In *Helms*, both parties conducted depositions, answered interrogatories, and produced

documents.  In the course of discovery, ConsumerInfo produced millions of emails and tens of thousands of documents, and shipped more than 100,000 recordings of phone calls from overseas to the United States.  The *Helms* court was also called upon to resolve a number of discovery disputes.  Later, the *Helms* court granted partial summary judgment to the plaintiff, ruling that CROA applied to the defendant.  That summary-judgment ruling was taken up on interlocutory appeal to the Eleventh Circuit.  The *Helms* court also considered plaintiff's class-certification motion, which the court denied.

During this heavily contested litigation, the parties began to mediate this dispute.  The mediation that led to settlement began in *Helms*, but the settlement negotiations always included *Browning*.  After lengthy and intense arm's-length negotiations guided by an experienced mediator over the course of more than a year of ongoing litigation, the parties reached their initial proposed settlement.  It was filed with this Court on February 28, 2006.  After the parties submitted their initial settlement for preliminary approval, the parties made certain modifications to the release and the class definition.  The Court reviewed and approved these modifications, resulting in the Amended Settlement that the Court preliminarily approved on December 27, 2006.

## B.    Class Certification And Settlement Notice

The notice program, described in the Court's preliminary-approval order as "extensive, multifaceted, and innovative," was successfully implemented consistent with the timeline established by this Court.  *See* Prelim Approval Order at 12 (Docket No. 137).  *First*, an official settlement website, which posted the Long-Form Notice and other settlement documents, became operational on January 26, 2007.  Aff. of Jennifer M. Keough ¶ 2, Feb. 6, 2007 (Docket No. 139).  *Second*, by February 27, 2007, email notices were disseminated to more than 14 million tentative class members who were identified from customer records.  Aff. of Jennifer M. Keough ¶ 2, Mar. 9, 2007 (Docket No. 141); Aff. of Jennifer M. Keough ¶ 2, Apr. 12, 2007 (Docket No. 142).  *Third*, by April 4, 2007, the Long-Form Notice was sent by U.S. standard mail to more than 3.9 million tentative

1   class members whose email notice was undeliverable or where no email address could be

2   located.  Aff. of Jennifer M. Keough ¶ 2, Apr. 12, 2007 (Docket No. 142).  *Fourth*,

3   publication notice appeared in the daily issue of the national edition of *USA Today* on

4   March 27, 2007, and in one weekend issue of the national edition of *USA Today* on March

5   23, 2007.  *Id.* ¶ 3.  Each of these notices was in the form approved by the Court.

6       **C.    CAFA Notice**

7           Out of an abundance of caution, the defendants also caused notice under the Class

8   Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715(b) (2005), to be sent to the

9   United States Attorney General, to attorneys general in all 50 states and the District of

10  Columbia, to the Federal Trade Commission's Western Regional Office, and to 11 other

11  state agencies that specifically monitor the credit industry.  CAFA notices were sent on

12  three separate occasions to inform these government agencies and update them on the

13  status of the proposed settlement.  On October 19, 2006, defendants gave their initial

14  CAFA notice, which also included 28 documents on a computer CD, providing these

15  agencies with an extensive background of the *Helms* and *Browning* litigation.  These CDs

16  included:  the complaints in both cases, the summary judgment order from *Helms*, the

17  class-certification order from *Helms*, the appellate briefing on the *Helms* summary

18  judgment before the Eleventh Circuit, the original and the Amended Settlement

19  Agreement in *Browning*, the settlement with Ronald W. Helms, the proposed settlement

20  notices, all court orders, and other pleadings.

21          On November 17, 2006, defendants updated their CAFA notice when the Court

22  issued orders setting a date for the preliminary-approval hearing.  *See* Letter of November

23  17, 2006 from Jennifer M. Keough to The Attorney General of the United States et al.  On

24  January 17, 2007, defendants sent a further CAFA update after the Court granted

25  preliminary approval and set a date for the Final Fairness Hearing.  *See* Letter of January

26  17, 2007 from Jennifer M. Keough to The Attorney General of the United States et al.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D.      Receipt Of Opt Outs

Under the court's preliminary-approval order, and as stated in the class notices, tentative class members had until May 15, 2007, to request exclusion from the settlement class.  Of the 14 million class members who received notice, 1,182 class members sent a timely opt-out letter to the Settlement Administrator.  Each week during the notice period the Settlement Administrator mailed a letter attaching all of the exclusion letters received that week to class counsel, to defense counsel, and to the Court.  *See, e.g.*, Letter of Jennifer M. Keough to Magistrate Judge Lloyd and Counsel (Feb. 16, 2007).  In addition, the Settlement Administrator sent to the Court a final packet of all of the exclusions received.  Letter of Jennifer M. Keough to Magistrate Judge Lloyd (May 24, 2007). Following the instructions of the Court's Clerk, this final packet of exclusions was filed under seal in order to protect the personal information of individuals who included sensitive information, such as a social security number, in their opt-out letter.  *Id.*

### E.      Receipt Of Objections

Class members also had until May 15, 2007, to object to the settlement.  Of the 14 million class members who were provided notice, only 138 objected to the settlement. The *Browning* Settlement Administrator's weekly letters and packets described above in section II.D, also included a copy of all of the objections received that week. Furthermore, the final packet filed with the Court on May 24, 2007, also included all of the objections filed during the notice period.  Letter of Jennifer M. Keough to Magistrate Judge Lloyd (May 24, 2007).

A more complete history of the litigation, the mediation and the terms of the settlement agreement is included in the preliminary-approval brief.  Prelim Approval Memorandum at 1-7, 13-16 (Docket No. 132-1).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.    ARGUMENT

The Court should finally approve this class-action settlement because the requirements of Federal Rule of Civil Procedure 23(a) and (b) are met.  Furthermore, the notice program was carried out as the Court directed and was not only reasonably calculated to apprise class members of the settlement, but was also the best notice practicable under the circumstances.  Finally, the settlement is fair, reasonable, and adequate, and the objections to the settlement lack merit and therefore should not be sustained.

### A.    The Requirements For Certification Of A Rule 23(b)(3) Settlement Class Are Satisfied

As the parties set forth in their preliminary-approval memorandum (Docket No. 132), the *Helms* court has already measured the requirements for class certification in a litigated context, under virtually identical circumstances, and found that the requirements of Federal Rule of Civil Procedure 23(a) were met and that the predominance requirement of Federal Rule of Civil Procedure 23(b)(3) was also met, *Helms v. ConsumerInfo.com, Inc.*, 236 F.R.D. 561, 564-67 (N.D. Ala. 2005).  The *Helms* court denied class certification, however, because class litigation would not be a superior method of adjudication when damages, if aggregated by the class trial procedure, could be "'grossly disproportionate to the conduct at issue.'"  *Id.* at 568 (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1271 (11th Cir. 2004)).  This reasoning does not apply to the class settlement, however, because the appropriate relief is agreed upon by the parties.  Moreover, a settlement class need not be "manageable" as a *trial* class action because no trial will occur.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619 (1997).

This Court, in its preliminary-approval order, held that the requirements of Rule 23(a) were satisfied and that the "tentative settlement class is superior to individual lawsuits."  Prelim. Approval Order at 3-4 (Docket No. 137).  This Court acknowledged the *Helms* court's concern that aggregation of claims for trial could bring about damages

disproportionate to Defendants' conduct, but recognized that such a concern was "simply . . . not applicable here in the context of the proposed settlement class, where the relief is agreed upon and no trial will occur." *Id.* at 4-5.

Given the holdings in *Helms*, and this Court's holding on preliminary approval, final approval of the settlement as a certified class action is appropriate.

**B.      Notice To Settlement Class Members Was The Best Notice Practicable And Reasonably Calculated To Apprise Class Members Of The Settlement, And CAFA Notice Was Also Implemented**

In accordance with the notice program outlined in the parties' preliminary approval papers, directed by this Court's December 27, 2006 Order, and summarized in section II.B. above, the parties implemented a comprehensive, four-part notice program designed to ensure that the tentative settlement class members were provided the best notice practicable.  The parties also served CAFA notice on federal and state officials.

**1.      Class-Action Notice And Class-Action Settlement Notice**

Federal Rule of Civil Procedure 23 requires the parties to provide notice to class members when a class action is certified and when a class action is settled.  Fed. R. Civ. P. 23(c)(2)(B) (certification notice for a Rule 23(b)(3) class action); Fed. R. Civ. P. 23(e)(1)(B) (settlement notice).  The standards that must be satisfied under Rule 23(c) and Rule 23(e) are different.  Federal Rule of Civil Procedure 23(c)(2)(B) provides that "[f]or any class certified under Rule 23(b)(3) the court must direct to the class members the best notice practicable under the circumstances . . . ," while Federal Rule of Civil Procedure 23(e)(1)(B) requires only that "[t]he court . . . direct notice in a reasonable manner to all members who would be bound by a proposed settlement."  In class-action settlements, it is common practice to provide a single notice program that satisfies both of these notice standards.  *See* DAVID F. HERR, ANNOTATED MANUAL FOR COMPLEX LITIGATION § 21.31 (4th ed. 2005) ("A judge who simultaneously certifies a class action and preliminarily approves a class-wide settlement typically combines notice of certification with notice of

settlement.") (citation omitted).  The four-part notice program implemented in this case satisfied both standards.

Here, class members received individual notice of the certification of the Rule 23(b)(3) class and the class-action settlement by email or, if necessary, by regular mail.  Notice was also provided on the official settlement website and by publication.  The forms of these notices were scrutinized by the Court and approved before they were disseminated to the 14 million class members.  Prelim. Approval Order at 14 (Docket No. 137).  The notice was written in plain language, and clearly and concisely stated the nature of the action; the class definition; the class claims, issues, and defenses; that class members could appear through counsel; when and how class members could elect to be excluded; and the binding effect of a class judgment on class members.  *See* Fed. R. Civ. P. 23(c)(2)(B).  It also informed class members of the amount of attorneys' fees requested by Class Counsel.  It thus satisfied the requirements of Rule 23(c)(2)(B), and also provided reasonable notice to all class members under Rule 23(e)(1)(B).

### 2.    CAFA Notice

The parties also provided notice in this case under CAFA, which, when applicable, requires the defendants to send to the appropriate state and federal officials a copy of the complaint, notice of scheduled judicial hearings, proposed or final notifications to class members, proposed or final class settlements, any other contemporaneous agreements between the parties, any final judgments or notice of dismissal, and the names of class members if feasible.  28 U.S.C. § 1715 (b) (1-8).  The defendants disclosed all of the CAFA information, except the names of the class members (which were not then available), to the United States Attorney General, to the attorneys general in all 50 states and the District of Columbia, to the Federal Trade Commission's Western Regional Office, and to 11 other state agencies that specifically monitor the credit industry.  *See* Exhibit A to Letter from Jennifer M. Keough to The Attorney General of the United States

at 3-8.  The defendants' CAFA notice on October 19, 2006, along with the updates on November 17, 2006 and January 17, 2007, fully satisfy the CAFA notice requirements.

### C.   The Proposed Class Action Settlement Is Fair, Reasonable, And Adequate, And Should Be Approved

A court may approve a class-action settlement after a hearing and on a finding that the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(1)(C).  The Ninth Circuit has identified numerous factors that the district court should consider when determining whether a proposed settlement is fair, reasonable, and adequate:  (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout trial; (4) the amount offered in settlement; (5) the extent of discovery completed; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.  *Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).  Additional factors courts may consider include, for example, the possibility of collusion, *Hanlon*, 150 F.3d at 1026, and the procedure through which the settlement was arrived, *Young v. Polo Retail, LLC*, No. C-02-4546, 2007 WL 951821, at * 3 (N.D. Cal. Mar. 28, 2007).  Although the district court "must show it has explored comprehensively all factors" to survive appellate review, *Hanlon*, 150 F.3d at 1026, one factor alone may prove determinative, *see Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998).

This settlement is the result of lengthy, arm's-length negotiations between the parties under the guidance of an experienced mediator.  This procedure shows that the settlement was not the product of collusion.  Beginning in August 2004, the parties in *Helms* participated in two rounds of mediation, both facilitated by Rodney A. Max as the mediator.  Mr. Max, who has practiced law since 1975, has for the past 10 years focused his practice on the mediation of complex civil litigation.  He has mediated hundreds of cases in 26 states and the District of Columbia.  In this case, the mediations were lengthy

and intense arm's-length negotiations that took place over the course of more than a year of ongoing litigation.  In the end, the negotiations produced the parties' settlement, which Mr. Max recommended to this Court as fair, reasonable, and adequate.  Aff. of Rodney A. Max ¶ 10 (attached as Ex. 6 to the preliminary-approval motion (Docket No. 132-7)).  The multiple rounds of settlement talks guided by an experienced mediator establish that the negotiation process was free of any collusion.

In addition to the appropriate settlement procedure described above, each of the other eight factors identified by the Ninth Circuit weighs in favor of final approval of this settlement.

### 1.      The Strength Of The Plaintiff's Case

Not surprisingly, the strength of plaintiff's case is viewed differently by opposing counsel.

Class Counsel assert that they discovered a new theory of liability under CROA, which had never before been asserted against companies selling credit scores and credit-monitoring products.  Class Counsel also point to their summary-judgment victory in *Helms*, where the Alabama district court held that the ConsumerInfo fell within CROA's statutory definition of a "credit repair organization."

Conversely, defendants' counsel emphasize that the *Helms* summary-judgment decision was a new interpretation of CROA and subject to dispute.  Indeed, the district judge, *sua sponte*, certified that decision for immediate appeal under § 1292b.  *Helms v. ConsumerInfo.com, Inc.*, 436 F. Supp. 2d 1220, 1238 (N.D. Ala. 2005).  Moreover, after briefing on whether the decision qualified for interlocutory appeal, the Eleventh Circuit accepted defendants' 1292(b) appeal.  *Helms v. ConsumerInfo.com, Inc.*, No. 05-13335-W (11th Cir., filed June 16, 2005).  The Eleventh Circuit appeal was still pending when the parties reached their settlement.  That appeal is now stayed.  Had the litigation continued, however, the parties recognize that the Alabama district court's summary judgment could have been reversed by the Eleventh Circuit, in which case the action would have been

1   dismissed, with no recovery for the plaintiff or his proposed class.  Indeed, the Alabama

2   district court expressly acknowledged the possibility of such an outcome when it

3   permitted the interlocutory appeal.  *Helms v. ConsumerInfo.com, Inc.*, 436 F. Supp. 2d

4   1220, 1238 (N.D. Ala. 2005) ("If, on appeal, this court's determination regarding

5   Defendant's status as a credit repair organization is reversed, Defendant's cross motion

6   for summary judgment would be granted, and the litigation would likely end.").

7        Significantly, *after* plaintiff's counsel here commenced the *Helms* lawsuit against

8   ConsumerInfo in Alabama, a different group of plaintiff's counsel commenced a similar

9   type CROA claim against Equifax in Georgia, alleging that Equifax fell within the

10  definition of a credit repair orgnaization because of its sale of credit scores and

11  credit-monitoring products.  After the Eleventh Circuit had stayed the appeal in *Helms*,

12  the *Hillis* court held that the defendants could *not* be held to be within the statutory

13  definition of a "credit repair organization" as a matter of law.  *Hillis v. Equifax Consumer*

14  *Servs., Inc.*, 237 F.R.D. 491, 516-17 (N.D. Ga. 2006).  The *Hillis* court held that

15  "Congress did not intend for the definition of a credit repair organization to sweep in

16  services that offer only prospective credit advice to consumers or provide information to

17  consumers so that *they* can take steps to improve their credit in the future."  *Id.* at 514

18  (emphasis in original).  The *Hillis* court also rejected the plaintiff's interpretation of

19  CROA because it "could lead to anomalous results that might thwart the efforts of

20  Congress and the FTC to increase consumer literacy regarding credit matters."  *Id.* at 515.[3]

21       This uncertainty — about whether the settlement class even has a legally valid

22  claim — is a factor that weighs heavily in favor of the proposed settlement.  *See Glass v.*

23  *UBS Fin. Servs., Inc.*, No. C-06-4068 MMC, 2007 WL 221862, at *3 (N.D. Cal. Jan. 26,

24  2007) (holding that "[t]he Court is aware of no controlling federal or state authority on the

25       [3] Following these rulings, and the *Hillis* court's denial of class certification, *Hillis*,

26  237 F.R.D. at 508, the *Hillis* case settled.  A nationwide class settlement was granted
    preliminary approval on February 8, 2007, and was granted final approval at a June 4,

27  2007 hearing and in the court's final judgment.  *Hillis v. Equifax Consumer Servs., Inc.*,
    No. 04-3400, slip op. (N.D. Ga. June 12, 2007).

28

1   issue . . . [and] the legal uncertainty at the time of settlement . . . favors settlement"). In

2   this case, the uncertainty is even greater. *Compare Helms*, 436 F. Supp. 2d at 1238

3   (holding that defendant "is a credit repair organization as defined by the CROA") *with*

4   *Hillis*, 237 F.R.D. at 516-17 (holding that genuine issues of material fact precluded

5   finding the defendants to be credit repair organizations as a matter of law). The Eleventh

6   Circuit's grant of interlocutory appeal of the *Helms* summary judgment casts further doubt

7   on "the strength of plaintiff's case" and is a further indication that CROA's reach presents

8   a substantial question of law. Moreover, at the time of this settlement, the *Helms* appeal

9   was fully briefed, enabling both sides to assess the strength of their positions and to weigh

10  the uncertainty of the outcome on appeal against the certain benefits provided by the

11  settlement. This legal uncertainty whether defendants, at the end of the day, would fall

12  within CROA's definition of a "credit repair organization," justifies the compromise of

13  these claims in the Amended Settlement Agreement.

14              **2.    The Risk, Expense, Complexity, And Likely Duration
                        Of Further Litigation**
15

16          Further adversary litigation, if it were to continue, would carry with it substantial

17  risks. To begin with, the settlement saves the parties the time, expense, and uncertainty of

18  further appellate briefing. The interlocutory appeal in *Helms*, already accepted by the

19  Eleventh Circuit, could have taken a year or more just to determine the scope of a "credit

20  repair organization" under CROA. And whatever the outcome in the Eleventh Circuit, the

21  losing party likely would have sought certiorari review of *Helms* in the Supreme Court.

22  Meanwhile, the same issue about the scope of CROA could have been presented again to

23  this Court, to the Ninth Circuit, and perhaps to the Supreme Court, thereby presenting

24  further risk of expense and delay. Thus, the complexity and uncertainty of this case,

25  coupled with the potential risk and expense of further litigation, weigh in favor of the

26  settlement. *Glass*, 2007 WL 221862, at *3-*4.

27

28

1

**3.     The Risk Of Maintaining Class Action Status
Throughout The Trial**

2

3          This is the highly unusual case where the same counsel have already litigated the

4   class-certification issue on behalf of a virtually identical class, and another federal district

5   court has already denied class certification.  *Helms v. ConsumerInfo.com, Inc.*, 236 F.R.D.

6   561, 568 (N.D. Ala. 2005) (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1271 (11th Cir.

7   2004)).  Notwithstanding that decision, Class Counsel were able to negotiate a class-

8   action settlement that provides a benefit to 14 million consumers — while permitting any

9   settlement class member who did not want to participate in that settlement to opt out of

10  the class.  Class Counsel obtained this settlement not only against the backdrop of the

11  adverse class decision in *Helms*, but also when this Court had previously noted its

12  skepticism regarding any motion that would seek class certification for trial in *Browning*,

13  when class certification had already been denied in *Helms*.  *See* June 13, 2006 Order at

14  5:10-12 (Docket No. 77) ("The court is skeptical about whether plaintiff will be able to

15  satisfy it that he can maintain a class action here against CIC – particularly where he

16  admittedly seeks to revisit the earlier denial of class certification against CIC in

17  Alabama.").

18         Furthermore, the Georgia federal court in *Hillis* has also denied class certification

19  in a similar CROA case, because that court was "persuaded by the analysis of the

20  superiority requirement set forth in *Helms*."  *Hillis*, 237 F.R.D. at 506 ("Given that

21  Plaintiff has not suffered any economic loss and complains only of technical violations,

22  and with an eye to the likelihood that class damages would be disproportionately large

23  when compared to Defendants' conduct, allowing this action to proceed in class form

24  simply is not superior.").

25         Given that two other federal courts have denied class certification in similar CROA

26  cases — and no court has certified a class — it is clear that the "risk of maintaining class

27  action status" is high.  This factor weighs heavily in favor of the proposed settlement.  *See*

28  *In re Heritage Bond Litig.*, 2005 WL 1594403, at *10 (C.D. Cal. June 10, 2005) (finding

1   that the risk of maintaining class action status throughout trial "weighs in favor of

2   approving" settlement in case where the Court had already granted plaintiffs' motion for

3   class certification).

### 4.        The Amount Offered

Given the uncertainty of plaintiff's legal claims under CROA, coupled with class

certification having been denied in two district courts, the consideration offered here — to

14 million class members — is more than adequate to support the proposed settlement.

Indeed, the proposed settlement provides the settlement class with two different types of

relief:  remedial and in-kind relief.  The remedial relief directly addresses the unique

CROA claim asserted by Class Counsel.  That is, even if CROA were applicable to

defendants — which defendants still deny — the language on defendants' websites that

allegedly violated CROA is being modified or removed.  The parties believe that upon

implementation of that relief, neither ConsumerInfo nor the Experian Entities will fall

within the statutory definition of a "credit repair organization" under CROA.  The

removal of that language provides a benefit to all class members, and that relief, by itself,

would justify this class-action settlement.

But here, defendants are also offering in-kind relief, providing each class member

with the choice of either a credit score or two months of credit monitoring.  These are the

same types of products these class members went to the websites to buy.  Finally, the

value of this in-kind relief is enhanced because each Settlement Class Member can choose

which benefit he or she prefers:  either a credit score or credit monitoring.

The in-kind relief is also reasonable in amount, given the value of similar products

offered for sale.  An Experian Plus Score currently retails for $5.00, while credit

monitoring, after automatic renewal, currently costs $9.95 a month.  Thus, the in-kind

relief is considerable when offered to the 14 million Settlement Class Members.

The relief offered to Settlement Class Members is also proportionate to the alleged

violation by defendants who — as the district court concluded in *Helms* — at most

"violated the technical requirements of 'a complex statutory scheme.'" *Helms*, 236
F.R.D. at 569 (quoting *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255 n.5 (11th
Cir. 2003)).  Moreover, the defendants have agreed to bear all of the costs of the notice
program to the 14 million class members and to administer the settlement benefit.

### 5.   The Extent Of Discovery Completed

By the time the terms of the Amended Settlement were agreed upon, the parties
had a "clear view of the strengths and weaknesses of their cases." *Young*, 2007 WL
951821, at *4 (citation omitted).  This litigation, and the *Helms* case that was also going
forward, were then well past the initial stages of litigation.  A great deal of discovery had
been taken in both cases.  The district court in *Helms* had issued decisions on the
procedural issue of class certification and on the substantive question of CROA's
application.  In addition, the question whether CROA applied had been fully briefed on
appeal.  Thus, the parties and the Court are able to assess the strength of this case and the
comparative benefits of the proposed settlement.  *Cf. Hanlon*, 150 F.3d at 1026 (providing
that a court should consider "the extent of discovery completed and the stage of the
proceedings" in making a final-approval determination).  This is not a case where a
lawsuit is filed and a proposed settlement quickly follows.

### 6.   The Experience And Views Of Counsel

The Settlement is the product of arm's-length negotiations that were conducted by
capable counsel who are very experienced in class-action litigation.  Having engaged in
extensive discovery and litigated significant questions in both *Helms* and *Browning*,
counsel for both sides believe that the Settlement reflects the relative strengths and
weaknesses of the parties' respective claims and defenses, as well as the substantial risks
presented in continuing the litigation.  Another highly qualified and experienced lawyer,
who acted as mediator in this case, has also recommended the settlement.

**7.     The Presence Of A Governmental Participant**

Although there is no direct governmental participant in this case, the defendants did provide CAFA notice of the proposed settlement to the Attorney General of the United States, to the Western Regional Office of the FTC, to the attorneys general of fifty states and the District of Columbia, and to nearly a dozen other state agencies. The Court's preliminary approval order set a deadline of May 15, 2007, for any state or federal governmental entity that planned to object. Following notice to 64 different federal and state officials and agencies, however, *no* state or federal governmental entity has lodged any objection to this settlement. The fact that no federal or state government entity has objected to the settlement in this case supports the fairness of the settlement.

**8.     The Reaction Of The Class Members
To The Proposed Settlement**

Out of the 14 million people provided notice, there were only 138 objectors to the settlement.[4] This is an objection rate of .00098%. Stated differently, there was only 1 objector for every 101,449 class members. By any measure, this objection rate was extraordinarily low, and is another factor weighing in favor of court approval.

Class-action settlements have been approved when such settlements have produced similar, and even much higher, objection rates. *E.g.*, *Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068 MMC, 2007 WL 221862, at *5 (N.D. Cal. Jan. 26, 2007) (approving a settlement with 8 objectors in a class of 13,176, an objection rate of .06% or 1 objector for every 1,647 class members); *In Re Broadcom Corp. Sec. Litig.*, No. SACV 01-275 DT, 2005 U.S. Dist. LEXIS 41983, at *18-19 (C.D. Cal. Sept. 12, 2005) (approving a settlement with 4 objectors in a class of 325,000, an objection rate of .0012% or 1 objector

---

[4] In the spreadsheet filed with the Court under seal on May 24, 2007, the *Browning* Settlement Administrator identified 139 total objectors. *See* Spreadsheet of Objectors. One objector, Gary Tisor, mailed two objections in two separate weeks; both of his objections were counted among the 139 objectors that were reported. *Id.* at 2. In addition, defendants are currently investigating whether all of the objectors are class members. The results of this inquiry may also lower the number of objectors.

1  for every 81,250 class members).  The low number of objectors in this case "raises a

2  strong presumption that the terms of a proposed class action are favorable to the class

3  members."  *Nat'l Rural Telecomm. Coop. v. DirecTV, Inc.*, 221 F.R.D. 523, 529 (C.D.

4  Cal. 2004).

5        The number of people who elected to opt out of the settlement was also very small.

6  In fact, only 1,182 people validly opted out of the settlement,[5] which amounts to an opt-

7  out rate of only .0084% or 1 exclusion out of every 11,844 class members.  Like the

8  objection rate, the opt-out rate is also low when compared with other settlements that have

9  been approved.  *E.g.*, *Glass*, 2007 WL 221862, at *5 (approving a settlement with an opt-

10  out rate of "approximately two percent").

11        **D.    The Objections To The Settlement Lack Merit**
             **And Should Not Be Sustained**

12

13        The 139 objections offered by class members generally fall into six categories:

14  (1) objections to the in-kind relief, (2) objections to the automatic-renewal feature in the

15  settlement, (3) objections to the requested amount of attorneys' fees, (4) objections to the

16  benefit process, (5) objections to the scope of the release, and (6) irrelevant or

17  incomprehensible objections.  All of these objections are without merit.

18        In considering each of these objections, it is important to bear in mind what almost

19  all of the objectors failed to appreciate:  that the uncertainty of the legal claims under

20  CROA and the denial of class certification by two district courts greatly undermine

21  objections that, at bottom, are simply asking for the settlement to provide more relief for

22  class members.  Moreover, any objector who was unhappy with the proposed settlement

23  had an easy remedy — simply opt out of the class and pursue his own claim.

24

25

26

27        [5] Another seven people made untimely requests for exclusion, bringing the total
     number of people who attempted to exclude themselves from the settlement to 1189.

28

MEM. IN SUPP. OF FINAL APP. OF AM.
SETTLEMENT — NO. C04-01463 HRL          - 18 -

1

**1.      Objections To The In-Kind Relief**

2

3          Objectors who complain about the in-kind relief assert three types of complaints:

4   (1) that the in-kind relief is, supposedly, not "worth" anything to class members, (2) that

5   the credit score option for in-kind relief supposedly is not valuable, (3) that the relief

6   offered is in the form of a coupon, or (4) that the relief is not a full refund, or is not

7   transferable by sale to other people.  None of these objections undermines the fairness,

8   adequacy, or reasonableness of the settlement, however.

9          First, the objections to the worth of the in-kind relief fail to appreciate that this

10  settlement class consists only of individuals who previously purchased defendants' credit

11  score and/or credit monitoring products.  The fact that class members have already sought

12  out similar products, shows that these products are valued by this group.

13         Second, some of the objectors say that credit scores are beneficial only if a person

14  is about to make a major purchase such as a house or a car.  This is simply not the case.

15  The Experian Plus Score offered to the class members here provides a numerical score

16  that informs a class member where his credit standing falls in a range as compared with

17  other consumers.  This is valuable information for anyone interested in keeping up with

18  his or her personal finances.  The Plus Score also lists what factors positively influenced

19  the class member's score and what factors negatively impacted the score.  In this way, the

20  Experian Plus Score provides valuable information to any class member who chooses it,

21  because the score will help the class member better understand his credit profile.  If any

22  class member is not interested in a credit score, however, that class member can always

23  choose two months of credit monitoring as his settlement benefit instead.

24         Third, some objectors erroneously allege that this is a "coupon" settlement, failing

25  to appreciate the differences between in-kind benefits and coupons.  To obtain value in a

26  coupon settlement, the class member must pay out-of-pocket money in order to receive

27  any benefit.  An in-kind benefit, on the other hand, such as the credit score or two months

28

1   of credit monitoring offered in this settlement, does not require the class member to pay

2   anything in order to receive the in-kind benefit.

3         Finally, some class members complain that they should get a full refund or an in-

4   kind benefit that is transferable.  These objections amount to little more than the

5   unsupported assertion that the class members could have gotten more.  The Ninth Circuit

6   has been clear that such objections are without merit.  *Hanlon v. Chrysler Corp.*, 150 F.3d

7   1011, 1027 (9th Cir. 1998) ("Of course it is possible, as many of the objector's affidavits

8   imply, that the settlement could have been better. . . .  Settlement is the offspring of

9   compromise; the question we address is not whether the final product could be prettier,

10  smarter or snazzier, but whether it is fair, adequate and free from collusion.").  The courts

11  rely on the parties, who best know the risks of future litigation, to determine the

12  appropriate point of compromise.  This is especially applicable here, where the legal

13  claims are uncertain and two courts have already declined to certify these claims as a class

14  action.

15          **2.**      **Objections To Automatic Renewal Of The Credit-Monitoring**
16                             **Benefit**

17        Some class members object to the automatic-renewal feature of the credit-

18  monitoring benefit that a class member may choose under the settlement.  These objectors

19  suggest that the automatic-renewal feature, sometimes called a negative-option plan,

20  might require people to accept automatic renewal in order to obtain a settlement benefit,

21  or might lead people to pay for credit monitoring without realizing it.  Neither point has

22  merit.

23        First, no class member has to accept the automatic-renewal feature.  Indeed, the

24  parties' settlement offers all class members two ways to avoid the automatic renewal

25  feature:  either the class member can simply choose the credit score instead of credit

26  monitoring, or the class member can choose credit monitoring, but exercise her right to

27  cancel within the 60-day benefit period.

28

Second, the objectors' suggestion that class members could overlook the automatic-renewal feature ignores the disclosures in the settlement papers and class notices.  The settlement agreement and the notices clearly disclose the automatic-renewal feature and explain exactly how a class member who chooses credit monitoring as his benefit may cancel his membership so that it will not automatically renew.  For example, the Amended Settlement Agreement provides that after enrollment in credit monitoring, the class member may cancel his credit-monitoring benefit before the expiration of the 60-day, settlement-benefit period by calling a toll-free number and requesting cancellation, thereby avoiding any charge for future months of credit monitoring.  Am. Settlement Agreement § IV.G.2 (Docket No. 132-2).  How to cancel is also clearly disclosed in the class notices and on the settlement website.  All of the notices sent to class members included on the very first page, in bold 14-point font, the following plain language disclosing the automatic-renewal feature:  "**[i]f you choose credit monitoring, and you don't cancel your credit-monitoring membership after using your code to obtain the credit-monitoring benefit but prior to the expiration of the 60-day, settlement-benefit period, you will be billed at the then-applicable rate, which is currently $9.95, for each month that you continue your membership.**"[6]  That disclosure is also repeated when class members go to the website to choose and obtain their settlement benefit.  Thus, the automatic-renewal feature and its conditions are fully disclosed.  Any class member who wishes to do so can avoid the automatic-renewal feature altogether simply by choosing a credit score as his settlement benefit, rather than credit monitoring.

### 3.    Objections To The Requested Amount of Attorneys' Fees

Some objectors complain that Class Counsel's attorneys' fee request of $2,550,000 is too high, or disproportionate to the benefit conferred on class members.  Under the

---

[6] Long-Form Notice at 1, 7, 9, 14 (Docket No. 132-2); Email Notice at 1 (Docket No. 132-2); Publication Notice at 1 (Docket No. 132-2).  As explained in earlier filings, these disclosures meet the disclosure requirements detailed in a consent decree between ConsumerInfo and the FTC.

Amended Settlement Agreement, plaintiff's counsel have agreed to request no more than $2,550,000 in attorneys' fees, costs and expenses, and defendants have agreed not to object to such a request. *See* Am. Settlement Agreement, § V (Docket No. 132-2). Pursuant to the Court's December 27, 2006 Order, Class Counsel are simultaneously filing materials in support of their fee petition, which separately address these objections.

### 4.   Objections To The Claims Process

Some objectors suggest that the process for obtaining a Settlement benefit is too complicated, while others object to providing their identifying information in order to claim a benefit. But settlement class members must register and provide personal identifying information because of the nature of the settlement benefits here — since credit scores and credit monitoring benefits both contain personal financial information that must be properly matched to the individual seeking to obtain it. Although the parties have endeavored to streamline the benefit process and to provide clear and concise instructions, the information required by the online registration process is needed to safeguard that the information is being provided to the right person. The court-approved notices explain the registration process in careful detail. Moreover, since all of the settlement class members have previously purchased credit scores or credit monitoring from defendants, they have all likewise previously provided similar identifying information when they completed those past transactions. Personal information obtained through the settlement's online registration form will be used only to process settlement benefits.

For class members who were reluctant to provide their identifying information because of concerns about Internet "phishing," skeptical class members had access to the settlement website and phone numbers that they could have called to verify that the settlement was legitimate. The notices they received also provided the full name and number of this case, which could be verified on this Court's docket.

### 5.    Objections To The Scope Of The Release

Some objectors have alleged that the release in this case is too broad, because it would extinguish CROA claims currently asserted by a plaintiff in a separately pending lawsuit.[7]  In addition, some objectors argue that it is improper for a class release to be based on the legal theories invoked instead of on the facts that were pled.  These objections lacks merit for two reasons.

First, any potential class member who had these concerns could simply opt out of the class, excluding herself from the settlement and thereby retaining the right to bring a separate lawsuit.

Second, the release contained in the Amended Settlement Agreement is not a broad release, but instead is narrowly tailored.[8]  This Court carefully considered the release contained in the original proposed settlement and issued several interim orders addressing the scope of the release.[9]  Thereafter, the parties made specific changes to the release that

---

[7] The named plaintiff and a member of the proposed class in *Schmidt v. ConsumerInfo.com, Inc.*, No. SACV05-912 CJC (ANx) (C.D. Cal.) have lodged this objection.  The *Schmidt* case, however, was recently denied class certification and subsequently settled.  The *Schmidt* stipulation of settlement was filed on June 8, 2007.

[8] Contrary to the allegations of the *Schmidt* objectors, defendants have consistently acknowledged the narrow nature of the *Browning* release in this settlement in their pleadings in *Schmidt*.  *See Schmidt v. ConsumerInfo.com, Inc.*, No. SACV05-912 CJC (ANx) (C.D. Cal.); Defs.' Mem. Of Points & Authorities In Opp. To Pl.'s Mot. For Class Certification at 3 ("Plaintiff's claims are not typical because the vast majority of the proposed class will be barred from asserting *a CROA claim* as part of a preliminarily approved settlement in another action.") (emphasis added); Defs.' Surreply In Opp. To Pl.'s Mot. For Class Certification at 5 (Plaintiff repeatedly mischaracterizes the terms and effect of the *Browning* Settlement. . . .  Defendants have never argued that the *Browning* Settlement disposes of "virtually all of Plaintiff's class claims," as Plaintiff claims (Reply, 1:5-6), but instead argued that the *Browning* Settlement releases one claim — the CROA claim — for virtually all of the *Schmidt* Class.").  The *Schmidt* filings cited here and in the previous footnote should be publically available on PACER, but will be furnished to the Court if the Court so requests.

[9] *See* Docket Numbers 119, 126, and 130.

the Court reviewed and approved.[10]  Indeed, the release in the parties' Amended

Settlement Agreement is already so narrow in scope that some claims that would typically

be released by res judicata are not released under this settlement.

### 6.      Irrelevant Or Incomprehensible Objections

In addition to the objections addressed above, certain class members also made

incomprehensible or irrelevant objections, which must be rejected because they are

incomprehensible or do not apply to the terms of the proposed settlement.

### a.      Incomprehensible Objections

About 10% of objection letters were simply incomprehensible. The very nature of

these objections makes it impossible for the Court or the parties to address them, but such

objections are to be expected from a settlement class that includes 14 million people.

### b.      Irrelevant Objections About A Class Member's Particular Credit Report

Another 10% of the class members who objected complained not about the class

settlement, but about alleged errors in his or her credit report.  For instance, some class

members complained that a lender's tradeline included an incorrect balance, or that a

particular line of credit should no longer be reported.  The opportunity to object to the

proposed settlement is not the proper forum to address issues concerning someone's

personal credit report.

### c.      Irrelevant Objections About A Class Member's Original Purchase Of The Defendants' Products

Another group of class members objected not to the automatic-renewal feature in

this settlement, but to the automatic-renewal feature in their original purchases of

defendants' products.  In those transactions, consumers who signed up for a trial

membership in credit monitoring received a credit report at no charge.  If the consumer

---

[10] *See* Docket No. 130.

1  did not cancel her credit-monitoring membership within the trial period, the membership

2  continued, and she was thereafter charged, as defendants' websites have always disclosed.

3  These objections are irrelevant to the allegations of CROA liability in this lawsuit.

4  Moreover, such claims have been fully addressed in other judicial proceedings.  They

5  have been rejected on the merits in at least two prior proposed class actions,[11] and they

6  have also been addressed in an FTC Consent Decree that provided a mechanism for

7  restitution for those consumers whom the FTC deemed affected.[12]  They thus have no

8  bearing on the settlement in this case.

9  **IV.   CONCLUSION**

10      After preliminary approval of this settlement class, the defendants caused the

11  notice program — which constituted the best notice practicable under the circumstances

12  — to be sent to 14 million class members, producing a very low number of objectors and

13  exclusions from this settlement.  None of the objections to the settlement has any merit.

14  Furthermore, this settlement class meets the Rule 23 requirements for class certification,

15  and this settlement is fair, reasonable, and adequate.  Consequently, the parties

16  respectfully move this Court to issue an Order finally approving this class-action

17  settlement.

18

19      [11] In *Clark v. Experian Information, Inc.*, the plaintiffs brought a class action in

20  Illinois federal court, claiming that customers who accepted a free credit report
   unknowingly enrolled in credit monitoring.  *See* 233 F.R.D. 508, 510 (N.D. Ill. 2005).

21  The *Clark* court denied class certification, *id.* at 511-12, and thereafter granted summary

22  judgment to defendants, rejecting the "plaintiffs' primary argument that the websites are
   deceptive by definition and that anyone paying for a service from defendants must have

23  been deceived."  *Clark v. Experian Info. Solutions, Inc.*, No. 03 C 7882, 2006 WL
   2224049, at *4 (N.D. Ill. Aug. 2, 2006).  In a similar California proposed class action,

24  *Cal. Consumer Action Network v. ConsumerInfo.com, Inc.*, No. GIC797867 (Super. Ct.
   San Diego County Ct. Apr. 1, 2003) Order Granting Demurrer and First Am. Compl., the

25  court held that "[d]efendant ConsumerInfo.com's advertising as a whole is not likely to

26  mislead a reasonable consumer."

27      [12] *See* FTC Consent Decree, (attached to preliminary approval memorandum as Ex.

28  11); Prelim. Approval Mem. at 34-37 (Docket No. 132-1).

1    Dated: June 14, 2007                          Respectfully submitted,

2

3
                                                   _____
4                                                  E. Clayton Lowe, Jr. (*pro hac vice*)
                                                   Peter A. Grammas
5                                                  Lowe & Grammas LLP
                                                   Liberty Park
6                                                  1952 Urban Center Parkway
                                                   Birmingham, Alabama 35242
7                                                  Telephone:       (205) 308-2400
                                                   Email:  clowe@lowegrammas.com
8
                                                   Counsel for Plaintiff
9

10                                                    /s/ Richard J. Grabowski
                                                   _____
11                                                 Jerome R. Doak (*pro hac vice*)
                                                   JONES DAY
12                                                 2727 North Harwood Street
                                                   Dallas, Texas  75201-1515
13                                                 Telephone:       (214) 220-3939
                                                   Facsimile:        (214) 969-5100
14                                                 Email:  jrdoak@jonesday.com

15                                                 Richard J. Grabowski (State Bar No.
                                                   125666)
16                                                 JONES DAY
                                                   3 Park Plaza, Suite 1100
17                                                 Irvine, California 92614-8505
                                                   Telephone:       (949) 851-3939
18                                                 Facsimile:        (949) 553-7539
                                                   Email:  rgrabowski@jonesday.com
19
                                                   Counsel for Defendants
20                                                 CONSUMERINFO.COM, INC.;
                                                   EXPERIAN NORTH AMERICA,
21                                                 INC.; and YAHOO! INC.

22

23   DLI-6117730v8

24

25

26

27

28

MEM. IN SUPP. OF FINAL APP. OF AM.
SETTLEMENT — NO. C04-01463 HRL        - 26 -

1   Dated: June 14, 2007                    Respectfully submitted,

2

3

4                                           E. Clayton Lowe, Jr. (*pro hac vice*)
                                            Peter A. Grammas
5                                           Lowe & Grammas LLP
                                            Liberty Park
6                                           1952 Urban Center Parkway
                                            Birmingham, Alabama 35242
7                                           Telephone:     (205) 308-2400
                                            Email: clowe@lowegrammas.com

8                                           Counsel for Plaintiff

9

10

11                                          Jerome R. Doak (*pro hac vice*)
                                            JONES DAY
12                                          2727 North Harwood Street
                                            Dallas, Texas 75201-1515
13                                          Telephone:     (214) 220-3939
                                            Facsimile:     (214) 969-5100
14                                          Email: jrdoak@jonesday.com

15                                          Richard J. Grabowski (State Bar No.
                                            125666)
16                                          JONES DAY
                                            3 Park Plaza, Suite 1100
17                                          Irvine, California 92614-8505
                                            Telephone:     (949) 851-3939
18                                          Facsimile:     (949) 553-7539
                                            Email: rgrabowski@jonesday.com

19                                          Counsel for Defendants
                                            CONSUMERINFO.COM, INC.;
20                                          EXPERIAN NORTH AMERICA,
                                            INC.; and YAHOO! INC.

21

22

23      DLI-6117730v8

24

25

26

27

28

MEM. IN SUPP. OF FINAL APP. OF AM.
SETTLEMENT — NO. C04-01463 HRL          - 26 -